1
2
3
4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7   HEWLETT PACKARD ENTERPRISE              Case No. 24-cv-02220-JST
    COMPANY,
8                     Plaintiff,            **ORDER GRANTING MOTIONS TO
                                            DISMISS IN PART**
9         v.
                                            Re: ECF Nos. 54, 84, 85, 86
10  INSPUR GROUP CO., LTD., et al.,

11                    Defendants.

12

13          Before the Court are several motions to dismiss for lack of personal jurisdiction and failure

14  to state a claim.  ECF Nos. 54, 84, 85, 86.  The Court will grant the motions in part and deny them

15  in part, with leave to amend.

16  **I.      BACKGROUND**

17          Plaintiff Hewlett Packard Enterprise Company ("HPE") is a global edge-to-cloud company

18  that pioneers technology that includes general-purpose servers, rack servers, high density servers,

19  and AI servers.  ECF No. 1 ¶ 1.  HPE was incorporated in Delaware and has its principal place of

20  business in San Jose, California.  *Id.* ¶ 4.

21          HPE alleges that a group of "related companies" has been directly and indirectly infringing

22  five patents "directed to various aspects of server technology" that HPE currently owns by

23  assignment.  *Id.* ¶¶ 2-24.  Those patents (hereinafter, "the asserted patents") are (1) U.S. Patent

24  No. 8,218,566; (2) U.S. Patent No. 7,634,671; (3) U.S. Patent No. 9,229,737; (4) U.S. Patent No.

25  8,335,891; and (5) U.S. Patent No. 8,108,508.  The group of related companies is comprised of

26  Defendant Inspur Group Co., Ltd. ("Inspur Group"), a Chinese corporation; Defendant IEIT

27  Systems Co., Ltd. ("IEIT Systems"), a Chinese corporation that is also known as Inspur Electronic

28  Information Industry Co., Ltd. and Inspur Information; Defendant Aivres Systems Inc. ("Aivres"),

United States District Court
Northern District of California

United States District Court
Northern District of California

1    a California corporation that was formerly known as Inspur Systems, Inc.; Defendant Betapex Inc.

2    ("Betapex"), a California corporation that was formerly known as Inspur Asset Holdings, Inc.;

3    Defendant Inspur USA Inc. ("Inspur USA"), which is registered as a foreign corporation in

4    California; and Defendant KAYTUS Singapore Pte. Ltd., a corporation formed under the laws of

5    Singapore that is now known as Kaytus Systems PTE. LTD. ("Kaytus").  Defendants Aivres,

6    Betapex, and Kaytus are allegedly wholly-owned "indirect subsidiaries" of Defendant IEIT

7    Systems.  *Id.* ¶ 15.  Throughout the complaint, HPE refers to all Defendants collectively as "Inspur

8    Defendants."  *See generally id.*

9        HPE alleges that the "Inspur Defendants," either alone or working in concert, make, use,

10    offer for sale, or import into the United States products that infringe the asserted patents, which

11    include servers, storage devices, networking devices, and software, such as the Inspur NF5280M5

12    server, the Aivres KR2280 server, the KAYTUS KR2280 server, the Inspur SAS3008 RAID

13    Adapter, and the Inspur Physical Infrastructure Manager ("ISPIM") software (hereinafter,

14    "accused products").  *Id.* ¶¶ 15, 22.

15        HPE asserts claims against all Defendants for direct, indirect (induced and contributory),

16    and willful infringement of (1) at least claims 1 through 18 of U.S. Patent No. 8,218,566; (2) at

17    least claim 1 of U.S. Patent No. 7,634,671; (3) at least claim 1 of U.S. Patent No. 9,229,737; (4) at

18    least claim 1 of U.S. Patent No. 8,335,891; and (5) at least claim 1 of U.S. Patent No. 8,108,508.

19        HPE filed the complaint on April 15, 2024.  ECF No. 1.  The present motions followed: (1)

20    a motion to dismiss for lack of personal jurisdiction or, in the alternative, for failure to state a

21    claim filed by Defendant Inspur Group, ECF No. 84; (2) a motion to dismiss for lack of personal

22    jurisdiction filed by Defendant Kaytus, ECF No. 85; (3) a motion to dismiss all claims premised

23    on the alleged infringement of U.S. Patent Nos. 7,634,671 and 8,335,891 on the ground that the

24    claims of those patents are directed to ineligible subject matter under 35 U.S.C. § 101, which was

25    filed by Defendants Aivres and Betapex and which Defendants Kaytus and IEIT Systems joined,

26    ECF No. 54; (4) a motion to dismiss all claims asserted against Defendant Betapex for failure to

27    state a claim, ECF No. 54; and (5) a motion to dismiss all claims for induced infringement and

28    willful infringement asserted against Defendant IEIT Systems for failure to state a claim, ECF No.

86.

On September 9, 2024, HPE voluntarily dismissed all claims against Defendant Inspur USA without prejudice.  *See* ECF No. 89.  On October 29, 2024, the Court granted a request by Defendants Inspur Group and Kaytus to stay discovery pending the resolution of their motions to dismiss for lack of personal jurisdiction.  *See* ECF No. 108.  The Court did not rule at that time on HPE's request for jurisdictional discovery in connection with Inspur Group and Kaytus' motions to dismiss for lack of personal jurisdiction.  *See id.* at 3.

## II.     JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## III.    MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants Inspur Group and Kaytus each move to dismiss under Rule 12(b)(2) all claims that HPE asserts against them for lack of personal jurisdiction.  ECF Nos. 84, 85.  HPE opposes the motions, arguing that the Court may exercise specific personal jurisdiction over Inspur Group and Kaytus under California's long-arm statute pursuant to a stream of commerce theory or under the so-called federal long-arm statute pursuant to Rule 4(k)(2).[1]  ECF Nos. 91, 92.  In the alternative, HPE requests leave to conduct jurisdictional discovery.

### A.      Legal Standard

A federal court may dismiss an action under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  The law of the Federal Circuit, rather than that of the regional circuit in which the case arises, applies when determining whether the exercise of personal jurisdiction over an out-of-state accused infringer is appropriate.  *See Nuance Communications, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1230 (Fed. Cir. 2010) (citation omitted); *see also MG Freesites Ltd. v. DISH Techs. L.L.C.*, 712 F. Supp. 3d 1318, 1324 (N.D. Cal. 2024) (Chen, J.) ("Federal Circuit law governs personal jurisdiction in patent cases.") (citation omitted).  "Personal jurisdiction over an out-of-state defendant is appropriate if the relevant state's long-arm statute

---

[1] HPE does not argue that the Court can exercise general personal jurisdiction over Inspur Group or Kaytus.

United States District Court
Northern District of California

permits the assertion of jurisdiction without violating federal due process." *Nuance Communications*, 626 F.3d at 1230 (citation omitted). "Because California's long-arm statute is co-extensive with federal due process requirements, the jurisdictional analyses under California law and federal law are the same." *Id.* (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir.2004)). "The constitutional touchstone for determining whether an exercise of personal jurisdiction comports with due process remains whether the defendant purposefully established 'minimum contacts' in the forum State." *Id.* (citation and internal quotation marks omitted).

"There are two kinds of personal jurisdiction—specific and general." *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005). General jurisdiction is not at issue in this case. "The Federal Circuit applies a three-prong test to determine if specific jurisdiction exists: (1) whether the defendant purposefully directed activities at residents of the forum [state]; (2) whether the claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair." *See Nuance Communications*, 626 F.3d at 1231 (citation omitted). "The plaintiff bears the burden of affirmatively establishing the first two elements of the due process requirement." *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015) (citation omitted). "If the plaintiff meets its burden, the burden shifts to the defendant to prove that personal jurisdiction is unreasonable." *Id.* (citation omitted).

A court may also exercise personal jurisdiction over a foreign defendant for claims arising under federal law under Federal Rule of Civil Procedure 4(k)(2), which is the "so-called federal long-arm statute." *See Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1290 (Fed. Cir. 2009). The question of whether personal jurisdiction can be exercised under Rule 4(k)(2) in a patent infringement case is governed by Federal Circuit law. *See id.* at 1292-93. Rule 4(k)(2) "allow[s] a court to exercise personal jurisdiction over a defendant if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process." *See id.* The third requirement "contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *See id.* at 1295.

United States District Court
Northern District of California

Where a court decides personal jurisdiction "based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a prima facie showing that defendants are subject to personal jurisdiction." *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1329 (Fed. Cir. 2008). "In evaluating this showing, the district court must construe all pleadings and affidavits in the light most favorable to the plaintiff." *Trintec*, 395 F.3d at 1282-83. "[W]here the plaintiff's factual allegations are not directly controverted, [they] are taken as true for purposes of determining jurisdiction[.]" *See Nuance Communications*, 626 F.3d at 1231 (citation and internal quotation marks omitted, modifications in the original).

A request for jurisdictional discovery in a patent infringement case is governed by the law of the regional circuit. *See id.* at 1235. "In the Ninth Circuit, discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* (citation and internal quotation marks omitted). On the other hand, a court may deny jurisdictional discovery "when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction, . . . or where the request for discovery is based on little more than a hunch that it might yield jurisdictionally relevant facts[.]" *Id.* (citations and internal quotation marks omitted).

### B.    Discussion

#### 1.    Inspur Group's motion to dismiss for lack of personal jurisdiction

Defendant Inspur Group, a Chinese company, moves to dismiss all claims against it under Rule 12(b)(2) for lack of personal jurisdiction.[2] ECF No. 84. Inspur Group argues that the Court cannot exercise personal jurisdiction over it because it has "no relevant contacts in the United States." *See id.* at 7.

HPE, which bears the burden of establishing personal jurisdiction, argues that the Court can exercise specific personal jurisdiction over Inspur Group (1) under California's long-arm

---

[2] In the alternative, Inspur Group moves to dismiss all claims asserted against it for failure to state a claim under Rule 12(b)(6). *See* ECF No. 84. The Court does not reach Inspur Group's motion to dismiss under Rule 12(b)(6) because it will grant HPE's request for jurisdictional discovery and will deny its motion to dismiss for lack of personal jurisdiction without prejudice to re-filing, if appropriate, after jurisdictional discovery is completed, as discussed in more detail below.

1    statute pursuant to the "stream of commerce" analysis based on allegations that Inspur Group

2    delivered and continues to deliver the accused products into the stream of commerce with the

3    expectation that they will be purchased in California and the United States; or (2) under the so-

4    called federal long-arm statute pursuant to Rule 4(k)(2) based on the same allegations just

5    described.  ECF No. 92.  In the alternative, HPE requests Court leave to conduct jurisdictional

6    discovery.

7         The Court first turns to HPE's stream-of-commerce theory.  The Federal Circuit has held

8    that the exercise of specific personal jurisdiction over a foreign defendant accused of patent

9    infringement is appropriate if the plaintiff shows that the defendant purposefully placed the

10   accused product into the stream of commerce "through an established distribution channel" that

11   had a termination point in the forum state, and the patent infringement claim against the defendant

12   is related to those activities.  *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558,

13   1563-65 (Fed. Cir. 1994).  In these circumstances, a court may exercise personal jurisdiction over

14   the foreign defendant even if it had no direct sales, assets, employees, or agents in the forum state

15   because the "'forum State does not exceed its powers under the Due Process Clause if it asserts

16   personal jurisdiction over a corporation that delivers its products into the stream of commerce with

17   the expectation that they will be purchased by consumers in the forum State.'"  *See id.* at 1566

18   (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

19        Here, HPE contends that the Court may exercise specific personal jurisdiction over Inspur

20   Group because it alleges facts and has submitted evidence showing that Inspur Group has placed

21   and is continuing to place the accused products into the stream of commerce in the United States

22   and California via an established distribution channel that involves the other Defendants, which

23   are its corporate affiliates.  ECF No. 92 at 13-19; *see also* ECF No. 1 ¶ 36.  The alleged

24   distribution channel includes Defendant IEIT Systems (a Chinese corporation of which Inspur

25   Group is a shareholder) and IEIT Systems' three allegedly wholly-owned subsidiaries, namely

26   Defendant Aivres (a California corporation that was formerly known as Inspur Systems, Inc.),

27   Defendant Betapex (a California corporation), and Defendant Kaytus (a corporation formed in

28   Singapore).  *See* ECF No. 1 ¶¶ 9-15, 36.  HPE alleges that Inspur Group holds three active

trademarks in the United States for the mark "Inspur." *See id.* ¶¶ 38-39, 57.  It further alleges that, before Inspur Group was added to the United States' Security Entity List on March 6, 2023, Defendant Aivres' office in Milpitas, California allegedly was branded with the "Inspur" mark and the accused products that Inspur Group allegedly placed into the stream of commerce into the United States also bore the "Inspur" mark.  *See id.*  After Inspur Group was placed on the Security Entity List, Inspur Group allegedly changed Defendant Aivres' name from Inspur Systems, Inc. to Aivres and removed the "Inspur" mark from Aivres' Milpitas, California office and from the accused products that Inspur Group allegedly places into the stream of commerce in the United States and California.  *See id.* ¶¶ 38-39, 40-42.  HPE alleges that Inspur Group continues to work in concert with Defendant Aivres to place the accused products into the stream of commerce in the United States and California and to sell the accused products through Defendant Avires in the United States and California under brand names that do not use the "Inspur" mark.  *See id.* ¶¶ 42-43.

HPE attached to its opposition screenshots of Inspur Group's website from 2023 that it contends support its allegations that Inspur Group and Defendant Aivres have worked and are working in concert to place accused products into the stream of commerce in California and the United States and to sell those products through Defendant Aivres in California and the United States.  The screenshots show that Inspur Group's website listed in 2023 "Inspur Systems, Inc." (which is Defendant Aivres' former name) and its address in Milpitas, California as the "US Main Office" for Inspur Group.  *See* ECF No. 92-8.  HPE represents that Inspur Group removed these statements from its website after it was placed on the Security Entity List in March 2023.  HPE also attached to its opposition technical documents for the accused products that, according to HPE, indicate that Inspur Group is involved in the sale and servicing of the accused products.  *See* ECF Nos. 92-2, 92-3, 92-4, 92-5, 92-6, 92-7.  HPE represents that it obtained these documents from Inspur Group's website and that they are cited in the complaint as proof that the accused products infringe HPE's patents.  The technical documents refer readers to the main Inspur Group website for more information, state that the products "should be subject to Inspur Group's commercial contracts and terms," and offer English-language technical and warranty support via

1   email addresses that use Inspur Group's domain (e.g., serversupport@inspur.com) and via United

2   States toll-free numbers.  *See, e.g.*, ECF No. 92-2 at 20, ECF No. 92-3 at 3.

3          Inspur Group counters that HPE has not plausibly pleaded or otherwise shown that Inspur

4   Group knowingly placed the accused products into the stream of commerce in California or the

5   United States.  ECF No. 95 at 1-6.  Inspur Group points to the declarations of its "Deputy

6   Manager," which provide that the company is not registered to do business in the United States;

7   has not had offices or employees in the United States; has not designed, made, used, sold, offered

8   for sale or imported for sale any of the accused products anywhere in the world; has not, alone or

9   with the aid of another, placed any accused products into the stream of commerce in California or

10   anywhere else in the United States; and that it has no decision-making authority over the business

11   activities of the other Defendants and has received no revenue from the sale of accused products

12   anywhere in the world.  *See* ECF Nos. 84-1, 95-1.  The declarations do not dispute, however, that

13   Inspur Group's website listed in 2023 Defendant Aivres' Milpitas, California office as its "US

14   Main Office."  The declarations also do not dispute that the technical documents that HPE cites in

15   the complaint as proof that the accused products infringe the asserted patents were accessible on

16   Inspur Group's website, connect the products to Inspur Group's commercial terms, and refer

17   readers to inspur.com email addresses and U.S. phone numbers for technical support and warranty

18   information.

19          The Court finds that pertinent facts that bear on the issue of whether the Court can exercise

20   personal jurisdiction over Inspur Group under a stream of commerce analysis are controverted,

21   and that additional discovery is necessary to permit the Court to determine that issue.  *Nuance*

22   *Communications Inc. v. Abbyy Software House*, 626 F.3d 1222, 1232 (Fed. Cir. 2010), which HPE

23   cites in its opposition, is instructive.  In that case, a Cyprus corporation was accused of patent

24   infringement for allegedly importing and selling accused products into California via a distribution

25   channel involving its subsidiary, which was a California corporation that allegedly marketed and

26   sold the accused products in the United States.  *See id.* at 1228-30.  The district court in California,

27   without first permitting jurisdictional discovery, granted the Cyprus corporation's motion to

28   dismiss for lack of personal jurisdiction on the ground that the plaintiff had not shown that the

United States District Court
Northern District of California

1   Cyprus corporation purposefully directed activities at California residents related to the patent-

2   infringement claims asserted against it.  *See id.*  The Cyprus corporation had maintained that it

3   was merely a holding company that did not control its subsidiary and neither imported nor sold

4   goods in California or elsewhere.  The Federal Circuit reversed the district court, holding that

5   jurisdictional discovery was necessary to determine the merits of the Cyprus corporation's motion

6   to dismiss for lack of personal jurisdiction.  *See id.* at 1235-36.  The Federal Circuit reasoned that

7   the plaintiff had pointed to sufficient evidence that raised questions about the veracity of the

8   Cyprus corporation's representations about its lack of contacts with California and lack of control

9   over its California subsidiary.  That evidence included the Cyprus corporation's website, which

10  promoted the accused products, portrayed the Cyprus corporation as a single company with offices

11  in many countries including the United States, and provided the contact information for retail

12  stores located in California that sold the accused products.  *See id.* at 1235-36.  On remand, after

13  permitting jurisdictional discovery, the district court ultimately concluded that it could exercise

14  personal jurisdiction over the Cyprus corporation.  *See Nuance Communications Inc. v. Abbyy*

15  *Software House*, No. C 08-02912 JSW, 2011 WL 1659574, at *4 (N.D. Cal. May 3, 2011).

16          Here, as in *Nuance Communications*, the question of whether the Court can exercise

17  personal jurisdiction over Inspur Group turns on whether the Court can find that Inspur Group

18  purposefully directed activities at California residents related to its alleged infringement of the

19  asserted patents.  As noted, Inspur Group argues that there is no basis for the Court to find that it

20  purposefully directed activities at California or United States residents because it filed declarations

21  stating, among other things, that it has not conducted business in California or the United States;

22  has not, alone or with the aid of another, placed any accused products into the stream of commerce

23  in California or anywhere else in the United States; and that it has no control over the day-to-day

24  business activities of the other Defendants, including Defendant Aivres.  *See* ECF Nos. 84-1, 95-1.

25  However, as the plaintiff in *Nuance Communications*, HPE has pointed to documents that

26  contradict Inspur Group's declarations or otherwise raise questions about their reliability,

27  including (1) the screenshots of Inspur Group's website from 2023 that show Defendant Aivres'

28  Milpitas, California address as the "US Main Office" for Inspur Group; and (2) the technical

documents for the accused products that HPE found on Inspur Group's website, which refer readers to the Inspur Group website for more information, indicate that products are subject to Inspur Group's commercial terms, and offer English-language technical support and warranty service via inspur.com e-mail addresses and U.S. toll numbers. Inspur Group has not explained why its website described Defendant Aivres' Milpitas, California address as its own "US Main Office" in 2023[3]; why the technical documents for the accused products were accessible on its website; why the technical documents indicate that the products discussed therein are subject to Inspur Group's commercial terms; or why the technical documents direct readers to Inspur Group's website and inspur.com email addresses and U.S. toll numbers for technical or warranty support.[4]

The Court finds that the documents to which HPE points suggest, contrary to Inspur Group's declarations and consistent with HPE's allegations, that Inspur Group may have conducted business in California via the Milpitas, California office of Defendant Aivres at least in 2023 (which is within the damages period in this case), and that Inspur Group and Defendant Aivres may be working in concert to sell the accused products in California and the United States. However, based on the record now before it, the Court cannot discern the extent of Inspur Group's contacts with California related to the patent infringement claims asserted against it. Accordingly, the Court finds that jurisdictional discovery is necessary under *Nuance Communications* to resolve Inspur Group's motion to dismiss for lack of personal jurisdiction. *See Nuance Communications*, 626 F.3d at 1235 (holding that discovery should ordinarily be granted "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of

---

[3] Inspur Group's only response to the screenshots showing that Aivres' Milpitas, California address was listed in 2023 as its United States main office is that it has never owned or leased any property in the United States. *See* ECF No. 95 at 11. That response does not foreclose the possibility that Inspur Group could have used Aivres' Milpitas, California location to sell or market the accused products in California and United States, or to otherwise conduct business in California and the United States.

[4] Inspur Group's only response to the technical documents is that it did not author or revise them and that it never controlled the email addresses and phone numbers listed in the documents. *See* ECF No. 95-1 ¶¶ 5-7. Inspur Group does not explain why the documents were on its website or reveal who controlled the email addresses and phone numbers listed in the documents.

the facts is necessary") (citation and internal quotation marks omitted). Inspur Group has not addressed, much less distinguished, *Nuance Communications*. *See generally* ECF No. 95.

The Court also finds that it cannot resolve, on this record, the question of whether it can exercise personal jurisdiction over Inspur Group under Rule 4(k)(2), which allows a court to exercise jurisdiction over a foreign defendant if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process. *See M-I Drilling Fluids UK Ltd. v. Dynamic Air Ltda*., 890 F.3d 995, 999 (Fed. Cir. 2018). The third requirement for jurisdiction under Rule 4(k)(2) "contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Id.* (quoting *Synthes*, 563 F.3d at 1295). For the same reasons discussed above, the Court cannot determine the extent of Inspur Group's contacts with the United States related to the patent infringement claims asserted against it. Jurisdictional discovery is necessary to resolve that issue.

Accordingly, the Court denies Inspur Group's motion to dismiss for lack of personal jurisdiction without prejudice to re-filing, if appropriate, after jurisdictional discovery on the jurisdictional matters and issues discussed in HPE's opposition, ECF No. 92, is completed. The Court orders the parties to meet and confer about the scope and duration of jurisdictional discovery and to file a joint proposal or competing proposals[5] for the Court's review and approval within fourteen days of the date this order is filed. *See Ross v. Abbott Vascular Inc.*, No. 19-CV-03794-JST, 2020 WL 4934487, at *9 (N.D. Cal. Apr. 6, 2020) (ordering the filing of a joint proposal regarding scope and duration of jurisdictional discovery). If the parties file competing proposals, each side may support its respective proposal with four pages of argument. The Court will then take the matter under submission.

---

[5] If the parties submit competing proposals, the Court will endeavor to choose, in all respects, the single proposal it concludes is most reasonable. *See* Michael Carrell & Richard Bales, *Considering Final Offer Arbitration to Resolve Public Sector Impasses in Times of Concession Bargaining*, 28 Ohio St. J. on Disp. Resol. 1, 20 (2013) ("In baseball arbitration . . . the parties . . . have every incentive to make a reasonable proposal to the arbitrator because the arbitrator will choose the more reasonable offer.").

United States District Court
Northern District of California

### 2.    Kaytus' motion to dismiss for lack of personal jurisdiction

Defendant Kaytus, which is a company formed under the laws of Singapore, moves to dismiss all claims against it for lack of personal jurisdiction.  ECF No. 85.  Kaytus argues that the Court cannot exercise personal jurisdiction over it because it has no presence in California or the United States.  *Id.* at 7.

HPE, which bears the burden of establishing personal jurisdiction, argues that the Court can exercise personal jurisdiction over Kaytus (1) under California's long-arm statute pursuant to the "stream of commerce" analysis based on its allegations that Kaytus sold the accused products to California residents through an established distribution channel involving other Defendants; or (2) under the so-called federal long-arm statute pursuant to Rule 4(k)(2) based on its allegations that Kaytus offered the accused products for sale and instructed customers as to their use at a trade show in California in 2023.  *See* ECF No. 91 at 12-19.  In the alternative, HPE requests the Court grant leave to conduct jurisdictional discovery.

Kaytus responds that HPE has not shown that the Court can exercise personal jurisdiction over it under California's long-arm statute pursuant to a stream-of-commerce analysis because HPE has not pointed to allegations or evidence showing that Kaytus specifically directed conduct at California.  *See* ECF No. 93 at 8-9.  Kaytus further contends that the Court cannot exercise personal jurisdiction over it under Rule 4(k)(2) because its business operations do not have a connection to the United States.  *See id.* at 11.

Here, even if Kaytus' contacts with California were insufficient to permit the Court to exercise specific personal jurisdiction over it under California's long-arm statue pursuant to a stream-of-commerce analysis, as Kaytus contends, HPE has shown that the Court can nevertheless exercise personal jurisdiction over Kaytus under Rule 4(k)(2).  As noted, Rule 4(k)(2) "allow[s] a court to exercise personal jurisdiction over a defendant if (1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process."  *See Synthes*, 563 F.3d at 1293.

As to the first requirement for exercising personal jurisdiction under Rule 4(k)(2), HPE argues, and Kaytus does not dispute, that it is met because HPE's claims against Kaytus arise out of federal law.  Thus, the Court finds that this requirement is satisfied.

As to the second requirement, HPE argues that it is met because Kaytus contends that it is not subject to personal jurisdiction in California and Kaytus has not identified another state in which HPE could have brought patent infringement claims against it.  The Court agrees.  Because Kaytus argues that "HPE would not have personal jurisdiction against [it] in any other district in the United States," *see* ECF No. 85 at 15, the second requirement for jurisdiction under Rule 4(k)(2) is satisfied.  *See Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1415 (Fed. Cir. 2009) (holding that if "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)").

The third requirement "contemplates a defendant's contacts with the entire United States" to determine whether the exercise of personal jurisdiction over the defendant would comport with due process.  *See Synthes*, 563 F.3d at 1295.  The exercise of personal jurisdiction under Rule 4(k)(2) comports with due process if three elements are met: (1) the defendant purposefully directed its activities at residents of the United States, (2) the claim arises out of or relates to the defendant's activities with the United States, and (3) assertion of personal jurisdiction is reasonable and fair.  *See id.* at 1297.  "Under this test, a court may properly assert specific jurisdiction, even if the contacts are isolated and sporadic, so long as the cause of action arises out of or relates to those contacts."  *See id.* (citation omitted).

As to the purposeful direction element, HPE argues that it is met because it alleges that Kaytus attended a trade show in California in 2023 during which it offered the accused products for sale and instructed customers as to their use.  HPE points to *Synthes*, 563 F.3d at 1297, for the proposition that those contacts are enough to satisfy the purposeful direction element.  In *Synthes*, the Federal Circuit held that a Brazilian corporation accused of patent infringement had purposefully directed its activities at residents of the United States because the corporation's employees brought the allegedly infringing products into the United States and displayed them at a trade show in California as part of the corporation's international sales efforts.  *See id.* at 1297-98.

United States District Court
Northern District of California

The Federal Circuit reasoned that these activities were sufficient to establish minimum contacts with the United States because they indicated that the Brazilian corporation had conducted company business at the trade show in connection with the accused products and tried to generate interest in the accused products among attendees at the trade show. *See id.* at 1298. Here, HPE alleges similar facts. HPE avers that Kaytus attended the 2023 OCP Global Summit in San Jose, California in October 2023, during which it discussed the accused products, offered the accused products for sale, and gave instructions for their use. *See* ECF No. 1 ¶¶ 73, 75. Kaytus does not point to evidence that contradicts these allegations; accordingly, the Court accepts the allegations as true for the purpose of resolving the present motion.[6] HPE's uncontroverted allegations plausibly suggest that Kaytus deliberately conducted company business in connection with the accused products, and tried to generate interest in the accused products, at a trade show attended by United States residents; that is enough to support a finding that Kaytus purposefully availed itself of the United States under *Synthes*, 563 F.3d at 1297-98, which Kaytus has not distinguished.[7]

As to the "arises under or relates to" element, the Court finds that it is met because HPE's claims against Kaytus for direct and indirect patent infringement arise out of or relate to Kaytus' alleged activities at the 2023 OCP Global Summit in San Jose, California, which, as noted, included offering the accused products for sale and instructing customers as to their use. *See* ECF

---

[6] Kaytus submitted a declaration by its director, *see* ECF No. 85-3, but it does not contradict HPE's allegations that Kaytus offered accused products for sale at the trade show and instructed customers as to their use. The declaration states that Kaytus "does not sell or offer for sale any of the products accused of infringement in the Complaint in the United States," *see id.* ¶ 15, but it is silent as to whether Kaytus offered the accused products for sale in the United States *in the past*, including when the trade show in question allegedly took place in October 2023. Although Kaytus argues that there were no Kaytus employees or products at the trade show, *see* ECF No. 93 at 6-7, it does not point to any evidence that establishes the absence of Kaytus employees or products at the trade show. The declaration that Kaytus filed does not address any matters pertaining to the trade show. *See generally* ECF No. 85-3.

[7] Kaytus relies on non-binding authorities that do not involve patent infringement claims and do not apply Federal Circuit law to the issue of personal jurisdiction to argue that the Court lacks jurisdiction over it under Rule 4(k)(2). *See* ECF No. 93 at 11. Kaytus' reliance on those authorities is misplaced, because the question of whether the Court can exercise personal jurisdiction over it under Rule 4(k)(2) is governed by Federal Circuit law given that Kaytus is accused of patent infringement. *See Synthes*, 563 F.3d at 1292.

No. 1 ¶¶ 73, 75.  HPE's patent infringement claims against Kaytus are based on allegations that that Kaytus and the other Defendants have offered the accused products for sale in the United States and have encouraged customers to use the accused products in a manner they know to be infringing.  *See, e.g.*, *Id.* ¶¶ 15, 22, 84.

The "fair and reasonable" element looks to whether exercising personal jurisdiction over the defendant would comport with fair play and substantial justice.  To determine whether this element is satisfied, courts consider "(1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the states in furthering fundamental substantive social policies."  *Synthes*, 563 F.3d at 1299.  The defendant bears the burden of presenting a "compelling case" that would render the exercise of personal jurisdiction unreasonable.  *See id.* (citation omitted); *see also Nuance Communications*, 626 F.3d at 1231 (citation omitted).

The Court finds that Kaytus has not presented a compelling case that the exercise of personal jurisdiction over it under Rule 4(k)(2) would be unreasonable or unfair based on the factors just described.

As to the first factor, Kaytus argues that it would be highly burdensome for it to defend the present lawsuit in this district.  However, Kaytus points to no evidence to support that assertion.  The declaration it filed is silent as to any burdens that Kaytus may have to endure by litigating this action in this district.  *See generally* ECF No. 85-3.  Because Kaytus has not pointed to any evidence showing that it would be burdened by litigating in this district, and because "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome," *see Synthes*, 563 F.3d at 1299 (citation and internal quotation marks omitted), the Court finds that this factor is neutral.

As to the second factor, the Court finds that it weighs heavily in favor of exercising personal jurisdiction over Kaytus because the United States has a "substantial interest" in "enforcing the federal patent laws."  *See id.* (citation omitted).  Kaytus does not argue otherwise.

As to the third factor, the Court finds that it also weighs heavily in favor of exercising personal jurisdiction over Kaytus because HPE has an interest in obtaining convenient and effective relief for the alleged infringement of the asserted patents. Kaytus makes no argument to the contrary.

The fourth and fifth factors "are concerned with the potential clash of substantive social policies between competing fora and the efficiency of a resolution to the controversy." *See id.* The Federal Circuit held in *Synthes*, 563 F.3d at 1300, which Kaytus has not distinguished, that these factors may not apply where, as here, the United States is the forum, and that even if they do apply in that circumstance, they weigh in favor of exercising personal jurisdiction where there is no evidence that the United States' interest in its foreign relations policies with the country where the defendant resides "will be hindered" by exercising personal jurisdiction over the defendant. *See id.* Here, there is no evidence indicating that the United States' interest in its foreign relations policies with Singapore would be hindered by exercising personal jurisdiction over Kaytus. Accordingly, the fourth and fifth factors weigh in favor of exercising personal jurisdiction over Kaytus. *See id.*

In light of the foregoing, the Court finds that it can exercise personal jurisdiction over Kaytus under Rule 4(k)(2). The Court, therefore, denies Kaytus' motion to dismiss for lack of personal jurisdiction.

## IV.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (ECF NO. 54)

Defendants Aivres and Betapex move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims for infringement of U.S. Patent Nos. 7,634,671 (the "'671 patent") and 8,335,891 (the "'891 patent") on the ground that the claims of those patents are directed to ineligible subject matter under 35 U.S.C. § 101. ECF No. 54. Defendants Kaytus and IEIT Systems join that motion. *See* ECF No. 85 at 6; ECF No. 86 at 2. Defendant Betapex also moves to dismiss all infringement claims asserted against it for failure to state a claim. *See* ECF No. 54 at 22-23.

### A.   Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual

United States District Court
Northern District of California

matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

"Section 101 of the Patent Act defines the subject matter eligible for patent protection" by providing that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be patented. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). It is well-established that "abstract ideas are not patentable." *Id.* (internal quotation marks and citation omitted). However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* at 217. Courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible applications of those concepts," on the other hand. *Id.*

To draw this distinction, courts engage in a two-step analysis. At step one, courts determine whether the claims at issue are "directed to" an abstract idea. *Id.* Claims that are "directed to a specific improvement in computer functionality" or "to a specific implementation of a solution to a problem in the software arts" are not directed to an abstract idea. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338-39 (Fed. Cir. 2016). "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish*, 822 F.3d at 1335-36). "The purely functional nature of [a] claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea." *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

1    Additionally, a claim that could be performed by a human, excluding "generic computer-

2    implemented steps," is often abstract. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d

3    1307, 1318 (Fed. Cir. 2016); *see also Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F.

4    Supp. 3d 1069, 1090 (N.D. Cal. 2016), *aff'd*, 684 F. App'x 971 (Fed. Cir. 2017) ("[A]utomation of

5    a process using a computer is . . . insufficient to save the asserted claims from abstractness.").

6        If the claims are directed to an abstract idea, courts proceed to step two and "consider the

7    elements of each claim both individually and as an ordered combination" to determine "whether

8    [the claim] contains an inventive concept sufficient to transform the claimed abstract idea into a

9    patent-eligible application." *Alice*, 573 U.S. at 217 (internal quotation marks and citation

10   omitted).  "Stating an abstract idea while adding the words 'apply it' is not enough for patent

11   eligibility.  Nor is limiting the use of an abstract idea to a particular technological environment."

12   *Id.* at 223 (internal quotation marks and citations omitted).  Instead, this test "is satisfied when the

13   claim limitations involve more than performance of well-understood, routine, and conventional

14   activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed.

15   Cir. 2018) (internal quotation marks, alteration, and citation omitted).  Both steps of the *Alice*

16   inquiry are informed by "the claims in light of the written description." *Amdocs (Israel) Ltd. v.*

17   *Openet Telecom, Inc.*, 841 F.3d 1288, 1299 (Fed. Cir. 2016).

18       "Whether a claim recites patent eligible subject matter is a question of law which may

19   contain disputes over underlying facts." *Berkheimer*, 881 F.3d at 1368.  But this does not mean

20   that patent eligibility cannot be decided on a motion to dismiss or motion for summary judgment,

21   as "not every § 101 determination contains genuine disputes over the underlying facts material to

22   the § 101 inquiry." *Id.*  "[P]atent eligibility can be determined at the Rule 12(b)(6) stage . . . when

23   there are no factual allegations that, taken as true, prevent resolving the eligibility question as a

24   matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed.

25   Cir. 2018).  In some cases, for example, the factual question of "[w]hether the claim elements or

26   the claimed combination are well-understood, routine, [or] conventional" may "be answered

27   adversely to the patentee based on the sources properly considered on a motion to dismiss, such as

28   the complaint, the patent, and materials subject to judicial notice." *Id.* at 1128.  "If there are claim

United States District Court
Northern District of California

18

1    construction disputes at the Rule 12(b)(6) stage, . . . either the court must proceed by adopting the

2    non-moving party's constructions, or the court must resolve the disputes to whatever extent is

3    needed to conduct the § 101 analysis, which may well be less than a full, formal claim

4    construction." *Id.* at 1125 (citations omitted).

5        "The burden to prove the ineligibility of any patent claim stays with the patent challenger

6    at all times." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1291 (Fed. Cir. 2024).

7        **B.    Discussion**

8            **1.    Whether the Claims of the '671 Patent Are Ineligible**

9        The '671 patent, which recites 11 claims, is titled "Determining power consumption in IT

10   networks." The claims of the '671 patent recite a method, computer system, and computer

11   program for determining the electric power consumption of devices in a managed IT network. *See*

12   '671 patent, claims 1-11.

13       According to the specification, there is a need to effectively manage data centers, which

14   are typically rooms or buildings where the devices on a network are centralized, to reduce the

15   amount of human supervision required to run the data center, to reduce maintenance costs (such as

16   costs associated with electric power consumption of the network devices), and to reduce errors.

17   *See id.* at 1:20-68; 2:1-4; 4:19-26. The specification provides that curbing or managing the

18   electric power consumption of network devices is important because, if the electric power

19   consumption of those devices is high, then that could increase the costs of running the data center.

20   *See id.* at 1:47-54. The specification describes a prior approach for determining the power

21   consumption of a data center, which involves human personnel "manually" creating an inventory

22   of all devices in the data center and calculating the power consumption of the devices. *See id.* at

23   1:62-68; 2:1-4. Downsides of that approach are that it is "labor intensive and error-prone," and

24   that the calculations may only be valid for a short period of time because devices may be added or

25   removed from the data center. *See id.* The specification also describers two prior network-based

26   systems for monitoring the electric consumption of households and IP phones, respectively, but

27

28

United States District Court
Northern District of California

the specification does not identity any problems with these systems or otherwise explain how those systems relate to the invention claimed in the '671 patent.[8]

The specification suggests that the claimed invention improves upon the prior, *manual* system for calculating the power consumption of network devices in a data center by automating the process, including by requiring the use of an autodiscovery tool to discover each device on the network and to collect data from each device.  The use of the autodiscovery tool obviates the need to conduct a manual inventory of the network devices and their power consumption, which is labor-intensive and error prone.  *See id.* at 4:37-45 ("Typically, the data pertaining to the IT network is automatically gathered by using an autodiscovery tool which is less laborious than having the data collected by employees of the company or organization."); *see also id.* at 1:62-67 (stating that the manual inventory of network devices and their power consumption is labor intensive and error-prone).

Below are the 11 claims of the '671 patent:

> 1. A method of determining power consumption of a managed information technology (IT) network comprising network devices having a management-addressable address, the method comprising:
>
>> running an autodiscovery tool to discover the network devices of the managed IT network;
>>
>> directing management requests to the management-addressable addresses of the network devices to obtain the electric power consumption values of the network devices;

---

[8] The first of the network-based systems is a system for monitoring power meters of households remotely by a host computer over a network, which involves configuring the power meters to measure the power consumption of loads attached to them, wherein a load is "typically one or several electricity-consuming devices belonging to a household."  *See* '671 patent, 2:5-14.  The electricity consumption data is sent by the power meters to the host device via transceivers connected to a wide area network.  *See id.*  The power meters are quarriable via a network communication protocol if they have their own address.  *See id.*  The second network-based system is a one that enables "polling of electric power consumption of network devices," which involves a technology that powers and sends data to IP phones and other devices over the Ethernet.  *See id.* at 2:15-30.  The electric consumption of the IP phones that are connected to the network can be queried by a network management application.  *See id.*  As noted, the specification does not identity any problems with these prior systems or otherwise explain how these prior systems relate to the invention claimed in the '671 patent.

United States District Court
Northern District of California

centrally collecting the electric power consumption values returned by the network devices;

determining whether the collected power consumption value for one of the network devices is beyond a low value or beyond a high value; and

triggering an alarm if the collected power consumption value is beyond the low value or beyond the high value.

2. The method of claim 1, wherein the electric power consumption of each network device is a current electric power consumption measured by a sensor.

3. The method of claim 1, further comprising:

calculating a total electric power consumption of the managed IT network by adding the electric power consumption values of the network devices, wherein the total electric power consumption is determined at different points of time and a statistical evaluation of the total electric power consumption values associated with the different points of time is performed.

4. The method of claim 1, wherein the electric power consumption value returned by a network device is a nominal electric power consumption value.

5. The method of claim 4, wherein the nominal electric power consumption value of a network device is determined by measuring the current electric power consumption of a device at different points of time and calculating an average thereof.

6. A computer system for determining total electric power consumption of a managed information technology (IT) network comprising network devices having a management-addressable address, the computer system being programmed to:

run an autodiscovery tool to discover the network devices of the managed IT network;

direct management requests to the management-addressable addresses of the network devices to obtain the electric power consumption values of the network devices;

centrally collect the electric power consumption values returned by the network devices;

determine whether the collected power consumption value for one of the network devices is beyond a low value or beyond a high value; and

trigger an alarm if the collected power consumption value is beyond the low value or beyond the high value.

7. A computer program stored on a storage device, and when the computer program is executed on a computer system, the computer system performs a method of managing power consumption of a managed information technology (IT) network comprising network devices having a management-addressable address, the method comprising:

running an autodiscovery tool to discover the network devices of the managed IT network;

directing management requests to the management-addressable addresses of the network devices to obtain the electric power consumption values of the network devices;

centrally collecting the electric power consumption values returned by the network devices;

determining whether the collected power consumption value for one of the network devices is beyond a low value or beyond a high value; and

triggering an alarm if the collected power consumption value is beyond the low value or beyond the high value.

8. The computer program of claim 7, wherein each of the network devices stores at least one power consumption value for the network device, and each network device is addressable in a hierarchy.

9. The computer program of claim 7, wherein the method further comprises:

providing, in a hierarchical Internet registration, a group level including nodes addressable in the hierarchy, wherein non-leaf nodes in the group level represent directories for management information including the collected electric power consumption values, and providing leaf nodes below the group level representing the network devices.

10. The method of claim 1, further comprising:

providing, in a hierarchical Internet registration, a group level including nodes addressable in the hierarchy, wherein non-leaf nodes in the group level represent directories for management information including the collected electric power consumption values, and providing leaf nodes below the group level representing the network devices.

11. The computer system of claim 6, further programmed to provide, in a hierarchical Internet registration, a group level including nodes

United States District Court
Northern District of California

addressable in the hierarchy, wherein non-leaf nodes in the group level represent directories for management information including the collected electric power consumption values, and provide leaf nodes below the group level representing the network devices.

HPE alleges that Defendants' Inspur Physical Infrastructure Manager ("ISPIM") software product infringes "one or more claims of the '671 Patent, including, but not limited to, claim 1." *See* ECF No. 1 ¶¶ 22, 30, 93.

Defendants argue that all 11 claims of the '671 patent are ineligible under § 101 because they are directed to the abstract idea of collecting information, analyzing it, and displaying the results, and because the elements of the claims, whether considered individually or in combination, do not recite a specific improvement to computer or network technology that goes beyond well-understood, routine, and conventional activities. Defendants argue claim 1 is representative of claims 2 through 11 and, therefore, claims 2 through 11 are ineligible for the same reasons as claim 1. Because HPE disputes that claim 1 is representative of claims 2 through 11, the Court will consider the patent eligibility of each claim of the '671 patent separately.

### a.    Claim 1

#### (i)    Alice step one

At step one of the *Alice* framework, courts "look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (internal quotation marks omitted). "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool.'" *Finjan*, 879 F.3d at 1303 (quoting *Enfish*, 822 F.3d at 1335-36 (internal quotation marks omitted)).

As noted, Defendants argue that claim 1 is ineligible under § 101 because it is directed to the abstract idea of collecting information, analyzing it, and then presenting the results. Defendants rely heavily on *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed.

23

1    Cir. 2016).  In *Electric Power Group*, the Federal Circuit held that claimed systems and methods

2    for performing real-time performance monitoring of an electric power grid, which involved

3    collecting data from multiple data sources, analyzing the data, and displaying the results, were

4    directed to an abstract idea.  The Federal Circuit reasoned that collecting information, analyzing

5    information, and presenting the results of the analysis, "without more," are abstract-idea processes.

6    *See id.* at 1353-54.  The Federal Circuit concluded that, because the claimed systems and methods'

7    purported advance was not one of "computer-functionality" but instead was an improvement on "a

8    process of gathering and analyzing information of a specified content, then displaying the results,

9    and not any particular assertedly inventive technology for performing those functions," the

10   claimed systems and methods were "clearly focused on the combination of th[e] abstract-idea

11   processes" of collecting information, analyzing it, and presenting the results and, as such, were

12   directed to excluded subject matter.  *See id.* at 1354.

13           The Court finds that claim 1 is analogous to the claims in *Electric Power Group* because it

14   is directed to the combination of the abstract-idea processes of collecting information of a

15   specified content (power-consumption data of network devices), analyzing the information, and

16   presenting the results of the analysis by triggering an alarm.  Specifically, claim 1 recites a method

17   that requires discovering devices on the network, sending requests for power-consumption

18   information to the devices, centrally collecting the power-consumption information returned by

19   the devices, determining whether the values are beyond a low or high value, and triggering an

20   alarm if the values are beyond the low or high value.  There is nothing in claim 1 or the

21   specification that suggests that the claimed method was intended to be an improvement to the

22   functionality of a computer or network itself.  *See Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957

23   F.3d 1303, 1309 (Fed. Cir. 2020) ("[S]oftware can make patent-eligible improvements to

24   computer technology, and related claims are eligible as long as they are directed to non-abstract

25   improvements to the functionality of a computer or network platform itself.").  Instead, the

26   specification indicates that the claimed invention is intended to improve the previously-used

27   *manual* process for calculating the power consumption a data center's network devices by using

28

United States District Court
Northern District of California

1    generic computer and network components and processes to automate it.[9]  *See, e.g.*, '671 patent at

2    4:37-54 ("the data pertaining to the IT network is automatically gathered by using an

3    autodiscovery tool which is less laborious than having the data collected by employees of the

4    company or organization").  However, the automation of a manual process using generic computer

5    and network components and processes does not constitute a "patentable improvement in

6    computer technology."  *See Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055

7    (Fed. Cir. 2017) (collecting cases).

8           HPE argues that claim 1 is not like the claims in *Electric Power Group* because all claims

9    of the '671 patent "recite further inventive steps including autodiscovery of network devices and

10   triggering an alarm," which, according to HPE, "provide an improvement to the computer system

11   *itself*."[10]  *See* ECF No. 69 at 15-16 (emphasis in the original).

12          The Court is not persuaded.  The specification does not provide that the autodiscovery

13   limitation of claim 1, whose purpose is to discover devices on the network by collecting

14   information from the devices, *see* '671 patent at 3:65-66, 4:37-45, requires any inventive

15   technology or techniques or improves the computer itself.  To the contrary, the specification

16   provides that the autodiscovery limitation can be performed using generic and known protocols

17   such as SNMP (Simple Network Management Protocol) or "by means of another network

18   management protocol or without any protocol but by means of a different methodology."  *See id.*

19   at 4:37-57.  Similarly, the specification does not indicate that the alarm limitation of claim 1,

20   whose purpose is to alert data center staff if the power-consumption values of a network device are

21

22   ───────────────────

     [9] In its opposition, HPE describes the invention claimed in the '671 patent in a manner consistent
23   with the Court's interpretation of the same.  *See* ECF No. 69 at 9 (arguing that the claimed
     invention "represents a significant system improvement over earlier 'manual' approaches [for
24   determining the power consumption of network devices in a data center], which were 'both labor
     intensive and error-prone'") (citation omitted).

25   [10] HPE also argues that *Electric Power Group* is distinguishable because it "was decided on
     summary judgment after discovery closed, not at the pleadings stage."  ECF No. 69 at 15.  This
26   argument is unavailing.  The Federal Circuit's findings and conclusions on § 101 issues in *Electric
     Power Group* were based on the claim language and the specification, not on evidence obtained
27   via discovery.  Accordingly, the fact that the § 101 issues were decided at the summary judgment
     stage in that case is immaterial and does not mean that the Court cannot rely on it to decide the
28   § 101 issues raised in the present motion to dismiss.

United States District Court
Northern District of California

1    beyond a certain range, *see* '671 patent, 10:55-67, 11:1-13, requires any inventive technology or

2    techniques or improves the computer itself.  Accordingly, the Court cannot find that the

3    autodiscovery and alarm limitations of claim 1 provide an improvement to the computer system

4    itself, as HPE contends.  The Court finds, instead, that the autodiscovery limitation is directed to

5    the abstract-idea process of collecting information and that the alarm limitation is directed to the

6    abstract-idea process of presenting the results of the analysis of the collected information.  *See*

7    *Electric Power Group*, 830 F.3d at 1354; *see also Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,

8    50 F.4th 1371, 1378 (Fed. Cir. 2022) ("We have repeatedly held claims 'directed to collection of

9    information, comprehending the meaning of that collected information, and indication of the

10   results, all on a generic computer network operating in its normal, expected manner' to be

11   abstract.") (citations omitted).

12       HPE also argues that claim 1 is directed to a specific technique that solves a "a known

13   problem with prior art *computer monitoring systems* which, for example, did not monitor every

14   device."  *See* ECF No. 69 at 14 (emphasis added).  That is unconvincing.  The specification does

15   not discuss any known problem with any prior art computer monitoring systems.  The portion of

16   the specification that HPE cites for the proposition that the claimed invention solves a "known

17   problem" with prior computer monitoring systems discusses a patent (namely, U.S. Patent No.

18   6,836,737) that teaches a method for monitoring power meters remotely with a host computer over

19   a network.  *See* '671 patent, 2:5-14.  The specification does not discuss any problem associated

20   with that method, nor does it state that the claimed invention improves upon that method in any

21   way.  As discussed above, the specification indicates that the claimed invention is intended to

22   improve upon a *manual* process for determining the power-consumption of a data center's

23   network devices by automating that process with generic computer components and processes, but

24   the automation of a manual process does not constitute a "patentable improvement in computer

25   technology."  *See Credit Acceptance*, 859 F.3d at 1055.  The authorities that HPE cites for the

26   proposition that claim 1 is directed to a specific solution to a computer problem are

27   distinguishable; none of those cases involved a claimed invention that used generic computer and

28

United States District Court<br>Northern District of California

1    network components and processes to automate a method that had previously been performed

2    manually, as the claimed method does here.[11]

3        Because claim 1 is directed to an abstract idea, the Court proceeds to step two of the *Alice*

4    framework.

### (ii)    *Alice* step two

6        At *Alice* step two, courts look for an "inventive concept" and consider the elements of each

7    claim both individually and as an ordered combination to determine whether the additional

8    elements of the claim transform the nature of the claim into a patent-eligible application.  *Alice*,

9    573 U.S. at 217.  To be eligible at step two, the claim's additional elements must involve more

10   than well-understood, routine, and conventional activity.  *Berkheimer*, 881 F.3d at 1367.  "An

11   inventive concept that transforms the abstract idea into a patent-eligible invention must be

12   significantly more than the abstract idea itself, and cannot simply be an instruction to implement

13   or apply the abstract idea on a computer."  *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility*

14   *LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

15       Defendants argue that claim 1 does not satisfy the requirements for patent eligibility at step

16   two because its elements, whether considered individually or in combination, do not contain an

17   inventive concept that transforms the abstract idea of collecting information, analyzing it, and then

18   displaying the results into patent-eligible subject matter.  ECF No. 54 at 14-15.  Defendants argue

19   that the '671 patent does not describe or claim any improvement to the functioning of the

20   computer, and that the patent describes each of the processes and components required to perform

21   the claimed invention as being conventional.  *See id.* at 15.

United States District Court
Northern District of California

---

[11] *See Ancora Techs., Inc. v. HTC Am., Inc*., 908 F.3d 1343, 1348 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) (specific computer problem solved by claimed invention related to computer security); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018) (specific computer problem solved related to computer virus protection); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018) (specific computer problem solved related to the user interface for electronic devices); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (specific computer problem solved related to computer animation); *TecSec, Inc. v. Adobe Inc*., 978 F.3d 1278, 1295 (Fed. Cir. 2020) (specific computer problem solved related to improving network security).

The Court agrees.  Claim 1 amounts to nothing more than the implementation of the abstract idea of collecting and analyzing information and presenting the results using computer and network components and processes, such as an "autodiscovery tool," a "managed IT network," "network devices," and an "alarm," that the specification indicates are conventional and well-understood.  *See, e.g.*, '671 patent, 4:50-57; 4:10-15; 4:27-50; 7:55-61; 10:55-67; 11:1-13.  As discussed above in connection with step one, HPE argues that the "autodiscovery tool" and "alarm" limitations of claim 1 are improvements to the computer itself, but the specification does not state that the performance of those limitations requires any inventive technology or techniques or that they otherwise improve the functioning of the computer.  Because claim 1 "do[es] not require any nonconventional computer, network, or display components, or even a non-conventional and non-generic arrangement of known, conventional pieces," but merely calls for the performance of the claimed abstract-idea processes of collecting information, analyzing it, and presenting the results by triggering an alarm on a set of generic computer and network components, the claim is ineligible at step two.  *See Electric Power Group*, 830 F.3d at 1355 (holding that claims directed to collecting and analyzing information and presenting the results were ineligible at step two because "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information") (citation and internal quotation marks omitted).

HPE's arguments to the contrary are unavailing.  HPE argues that claim 1 is patent eligible at step two because it recites an "inventive concept" that solves the "power consumption management problem in the claimed network system," which HPE contends is a "computer-specific problem."  *See* ECF No. 69 at 17, 20.  HPE argues that the '671 patent's solution to this "computer-specific problem" is "plausibly touted by both the '671 patent specification and HPE's Complaint."  *See id.* at 20.  This argument fails.  The portion of the specification that HPE relies upon does not identify any computer-specific problem.  Instead, it identifies problems with the prior *manual* method for determining the power consumption of network devices in a data center, with those problems being that the manual method is "labor intensive and error-prone."  *See* '671

patent, 1:62-67, 2:1-4.  As discussed above, the specification indicates that the claimed invention improves upon that *manual* method for determining the power consumption of network devices because the claimed invention automates that process, thus making it more efficient and less error-prone.  *See, e.g.*, *id.* at 4:37-54.  The allegations in the complaint support this interpretation of the claimed invention.  *See* ECF No. 1 ¶ 95 (alleging that the claimed invention increases "data center efficiency" and "reduces errors" by "utilizing real-time, *automated*, remote monitoring" of network device power consumption) (emphasis added).  However, as noted, the "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology."  *See Credit Acceptance*, 859 F.3d at 1055-57 (collecting cases).  Thus, the Court cannot find that claim 1 recites an inventive concept that solves a computer-specific problem.  *Cf. Cooperative Entertainment, Inc. v. Kollective Tech., Inc*., 50 F.4th 127, 131-35 (Fed. Cir. 2022) (holding that the district court erred in dismissing claims for patent infringement on § 101 grounds at the pleading stage because the patent claims recited inventive concepts that the specification touted as "specific improvements" to computer functionality compared to the prior art and the complaint plausibly alleged that those improvements involved more than well-understood, routine, and conventional activity); *DDR Holdings, LLC v. Hotels.com, L.P*., 773 F.3d 1245, 1257 (Fed. Cir. 2014) (holding that claims were patent eligible at step two because they recited an inventive concept that solved an internet-specific problem that involved modification of conventional mechanics behind website display to produce a dual-source integrated hybrid display).

HPE also argues that "[c]ourts have upheld alarm-related claims similar to the '671 patent as providing an 'inventive concept' conferring patent eligibility under *Alice* Step Two, either alone or in addition to finding eligibility under *Alice* Step One."  *See* ECF No. 69 at 17-18.  The Court finds that the claims in the cases to which HPE points are not sufficiently analogous to the ones at issue here; accordingly, these authorities, which are not binding, do not alter the Court's analysis and findings at step two.  *See Alarm.com Inc. v. ipDatatel*, LLC, 383 F. Supp. 3d 719, 734 (S.D. Tex. 2019); *RICMIC, LLC v. Salient Networks, Inc*., No. 20-CV-2015-CAB-MDD, 2021 WL

1   1293835, at *8 (S.D. Cal. Apr. 7, 2021); *Rosen Techs. LLC v. Lennox Int'l Inc.*, No. 3:22-CV-

2   00732-K, 2023 WL 36074, at *7 (N.D. Tex. Jan. 4, 2023).

3          The Court concludes that claim 1 is not patent eligible under § 101.  Accordingly, the

4   Court grants Defendants' motion to dismiss infringement claims asserted in the complaint that are

5   premised on the alleged infringement of claim 1, with leave to amend.

6                          **b.       Claims 2 through 11**

7          Defendants contend that the rest of the claims of the '671 patent, claims 2 through 11, are

8   ineligible under § 101 for the same reasons as claim 1, because claims 2 through 11 are directed to

9   the same abstract idea as claim 1 at step one and, at step two, they merely invoke conventional

10  computer and network components and activity to apply the abstract idea identified at step one.

11         HPE disagrees, arguing that claims 2 through 11 contain limitations that are not found in

12  claim 1 that "separately confirm the patent-eligibility of those claims."  ECF No. 69 at 18.

13         After carefully examining claims 2 through 11 individually, the Court agrees with

14  Defendants.  At step one, claims 2 through 11 are directed to the abstract-idea processes of

15  collecting and analyzing information and presenting the results of the analysis by triggering an

16  alarm, without more.  *See Electric Power Group*, 830 F.3d at 1353-54.  At step two, the claims are

17  not patent eligible because they merely call for the performance of the abstract-idea processes of

18  collecting information, analyzing it, and presenting the results by triggering an alarm on a set of

19  generic computer and network components, and because the specification does not describe an

20  inventive concept that is recited in those claims that constitutes a specific improvement to the

21  computer itself and that involves more than well-understood, routine, and conventional activity.

22  *See id.* at 1355; *cf. Cooperative Entertainment*, 50 F.4th at 131-135.  Accordingly, the Court finds

23  that claims 2 through 11 are ineligible under § 101 for the same reasons as claim 1.

24         HPE's arguments in opposition fail.  With respect to claim 2, HPE argues that it contains

25  the additional limitation of "current electric power," which it contends "would independently

26  support eligibility" of the claim.  *See* ECF No. 69 at 18.  HPE argues that the limitation "current

27  electric power" "may require a nearly real-time measured value[.]"  *See id.*  The Court is not

28  persuaded that the "current electric power" limitation, even when construed as requiring a "nearly

United States District Court
Northern District of California

real-time measured value," as HPE proposes, would support finding that claim 2 is patent eligible.[12] "Current electric value," as used in claim 2, simply refers to obtaining an electric power consumption value of the network devices that is "current," or measured nearly in real-time, as HPE contends, as opposed to obtaining an electric power consumption value of the network devices that was measured at a specific point in time and not updated, or measured at specific points in time and then averaged. *See, e.g.*, '671 patent, 6:42-67, 7:1-14. The "current electric power" limitation does not alter the Court's conclusion that claim 2 is not patent eligible, because there is no indication in the specification that obtaining the current electric power of network devices is an inventive concept that improves the computer itself compared to the prior art and that involves more than the performance of well-understood, routine, and conventional activities. *Cf. Cooperative Entertainment*, 50 F.4th at 131-135.

With respect to claims 3, 4, and 5, HPE argues that they "recite different aspects of an electrical power consumption method beyond what is recited in claim 1 that are not merely conventional computer functions." *See* ECF No. 69 at 18. The limitations of claims 3, 4, and 5 that are not recited in claim 1 recite various ways of calculating the power consumption of network devices. *See* '671 patent, claims 3-5. Those limitations do not alter the Court's conclusion that claims 3 through 5 are not patent eligible, because there is no indication in the specification that that the different ways of calculating the power consumption of network devices recited in the claims improve the computer itself compared to the prior art and involve more than the performance of well-understood, routine, and conventional activities. *Cf. Cooperative Entertainment*, 50 F.4th at 131-135.

---

[12] HPE argues, in passing, that "claim construction may be required before the Court can resolve Defendants' Section 101 challenge" to the '671 patent and that the Court "should not decide patent eligibility until after claim construction." *See* ECF No. 69 at 21. The only term of the '671 patent that HPE argues "may" require construction is "current electric power." *See id.* Because the Court has adopted HPE's proposed construction of "current electric power" for the purpose of resolving the present motion, there is no need to postpone the resolution of Defendants' § 101 challenge to the '671 patent until the claim construction stage. *See Aatrix*, 882 F.3d at 1125 ("If there are claim construction disputes at the Rule 12(b)(6) stage, we have held that either the court must proceed by adopting the non-moving party's constructions, . . . or the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction.").

United States District Court
Northern District of California

1    With respect to claims 6 and 7, HPE does not point to any limitations that are not found in

2 claim 1 to attempt to show that those claims are patent eligible. *See* ECF No. 69 at 18-20. The

3 Court interprets that as an implicit concession that claims 6 and 7 are ineligible under § 101 for the

4 same reasons as claim 1, as Defendants have shown and the Court has found.

5    With respect to claim 8, HPE argues that it "further recites that the network devices are

6 addressable in a hierarchy," but it does not explain the purported significance of the hierarchy

7 limitation to the patent eligibility of claim 8. *See* ECF No. 69 at 18. The Court finds that claim

8 8's limitation that "each network device is addressable in a hierarchy" does not alter its conclusion

9 that claim 8 is not patent eligible, because there is no indication in the specification that addressing

10 network devices in a hierarchy is a solution that improves the computer itself compared to the

11 prior art and that involves more than the performance of well-understood, routine, and

12 conventional activities. *Cf. Cooperative Entertainment*, 50 F.4th at 131-135.

13    Finally, with respect to claims 9 through 11, HPE argues that they recite additional

14 limitations not recited in claim 1 that "are directed to a data structure including novel network

15 nodes" for storing the power-consumption data of network devices, which "the specification touts

16 as a computer improvement." *See* ECF No. 69 at 19-20. The limitations in claims 9 through 11 to

17 which HPE points recite how the Internet registration tree, which is a standardized structure,

18 should be modified to store the power-consumption data collected from the network devices. *See*

19 '671 patent, claims 9-11; *see also id.* at 3:23-25; 5:54-67; 6:1-13; 6:24-27; 12:26-67; 13:1-47.

20 These limitations do not alter the Court's conclusion that claims 9 through 11 are not patent

21 eligible, because HPE has not pointed to any portion of the specification that indicates that the

22 modifications to the Internet registration tree recited in claims 9 through 11 improve the computer

23 itself compared to the prior art and involve more than the performance of well-understood, routine,

24 and conventional activities.[13] *Cf. Cooperative Entertainment*, 50 F.4th at 131-135 (holding that

25

26 _____

[13] The portions of the specification that discuss the Internet registration tree suggest that the
27 modifications to the Internet registration tree recited in claims 9 through 11 do not involve more
than the performance of well-understood, routine, and conventional activities, because they
28 provide that the Internet registration tree is a standardized structure that was designed to be
modified, customized, or extended to suit the specific needs of different users. *See id.* at 3:23-25,
5:54-67; 6:1-13; 6:24-27; 12:26-13:47. HPE has not pointed to any portion of the specification

United States District Court
Northern District of California

the district court erred in dismissing claims for patent infringement on § 101 grounds at the pleading stage because the patent claims recited inventive concepts that the specification touted as "specific improvements" to computer functionality compared to the prior art and the complaint plausibly alleged that those improvements involved more than well-understood, routine, and conventional activity).

The Court concludes that claims 2 through 11 are not patent eligible under § 101. Accordingly, the Court grants Defendants' motion to dismiss claims asserted in the complaint that are premised on the alleged infringement of claims 2 through 11, with leave to amend.

### 2.    Whether the Claims of the '891 Patent are Ineligible

The '891 Patent, which recites 12 claims, is titled "Method And System For Configuring A Storage Array."  The specification states that, in a typical computer system, a storage array (which is a type of peripheral system) may be configured by the computer's basic input/output system (BIOS).  '891 patent, 1:6-23.  The firmware of a computer system may include a configuration utility for configuring the storage array, which can be initiated by a user during "big real mode," which occurs prior to loading the computer's operating system (i.e., while the computer is starting up).  *See id.*; *see also id.* at 1:45-50.  However, the functionality offered by such a configuration utility will generally be limited to adhere to the limited "base memory" available to the computer's processor for code execution during "big real mode"; that limit is approximately 1 megabyte (MB) of RAM.  *See id.*  The specification states that a prior method for avoiding the 1MB of RAM base memory limitation involved programming the configuration utility to operate in "protected mode" instead of "big real mode," but that method presented challenges, such as requiring the use of additional hardware drives, which introduced the risk of incompatibilities across different computing platforms.  *See id.* at 1:49-67.

The specification provides that an "exemplary embodiment" of the claimed invention avoids the 1MB of RAM base memory limitation by using the "local RAM existing on [an] array controller," instead of the base memory available to the computer's processor, to run on the array

---

indicating that the modifications recited in claims 9 through 11 involve techniques or activities that were not already well-known or routine.

controller a configuration utility that allows a user to configure the storage array. *See id.* at 2:1-22. To communicate with the user, the configuration utility that runs on the array controller may send display data to a monitor through the computer's processor and may receive key strokes from a keyboard through the computer's processor. *See id.* Because the configuration utility that runs on the array controller "uses the local RAM existing on the array controller, rather than the base memory available to the [computer's] processor, the configuration utility is able to access more than 1 MB of memory for code execution." *See id.* at 2:15-19. "Thus, the 1 MB base memory limitation may be avoided even though the configuration utility runs during real mode." *See id.* at 2:19-22.

The 12 claims of the '891 patent are the following:

1. A computer system, comprising:

an array controller configured to run an array configuration utility, the array configuration utility being configured to generate information corresponding to a menu of user options, receive user instructions corresponding to a user selection of a user option, and process a configuration task in response to the user selection; and

a processor configured to receive the information from the array controller and send the user instructions to the array controller.

2. The computing system of claim 1, wherein the array configuration utility is configured to run during real mode operation of the computer system.

3. The computing system of claim 1, wherein the processor comprises a central processing unit of the computer system.

4. The computing system of claim 1, comprising a plurality of hard disk drives coupled to the array controller.

5. The computing system of claim 4, wherein the plurality of hard disk drives comprise a redundant array of inexpensive disks (RAID) array.

6. The computing system of claim 1, comprising a Peripheral Component Interconnect Express (PCIe) bus that couples the array controller to the processor.

7. The computing system of claim 1, wherein the processor comprises a remote management controller coupled to a remote computer via a network.

8. The computing system of claim 7, comprising a memory accessible to the processor and the remote management controller.

9. One or more tangible, machine-readable media, that store machine-readable instructions executable by one or more processors to perform a method for configuring a storage array, the tangible, machine-readable media comprising:

machine-readable instructions that, when executed by an array controller, cause the array controller to generate information corresponding to a menu of user options and send the information to a host processor; and

machine-readable instructions that, when executed by the host processor, cause the host processor to receive keystroke information from a keyboard and send the keystroke information to the array controller.

10. The tangible, machine-readable media of claim 9, comprising machine-readable instructions that, when executed by the array controller, cause the array controller to perform an array configuration task corresponding to the keystroke information received from the host processor.

11. The tangible, machine-readable media of claim 9, comprising machine-readable instructions that, when executed by the array controller cause the array controller to save a new configuration setting of the storage array.

12. The tangible, machine-readable media of claim 9, comprising machine-readable instructions that, when executed by the host processor cause the host processor to send the information to a monitor.

HPE alleges that the accused products infringe "one or more claims" of the '891 patent, "including but not limited to" claim 1.  *See* ECF No. 1 ¶ 119.  HPE further alleges that "[t]he claimed invention in the '891 Patent is an improvement to systems for configuring storage arrays" that overcomes the limitations of prior systems "by utilizing array controllers (and its associated more abundant RAM) to run configuration utilities."  *See id.* ¶ 121.

Defendants argue that all 12 claims of the '891 patent are ineligible under § 101 because they are directed to the abstract idea of receiving user selections from a menu of options and

United States District Court
Northern District of California

performing tasks in response to the user selections, and because the elements of the claims, whether considered individually or in combination, do not recite a specific improvement to computer or network technology that goes beyond well-understood, routine, and conventional activities.  Defendants argue claim 1 is representative of claims 2 through 12 and, therefore, claims 2 through 12 are ineligible for the same reasons as claim 1.  Because HPE disputes that claim 1 is representative of claims 2 through 12, the Court will consider the patent eligibility of each claim separately.

### a.    Claim 1

#### (i)    *Alice* step one

As noted above, at step one of the *Alice* framework, courts consider the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).

Defendants argue that claim 1 is directed to the abstract idea of receiving menu options from a menu of options and then performing configuration tasks based on the user selections.  *See* ECF No. 54 at 18-19.  Defendants contend that claim 1 is not directed to the improvement that HPE alleges in paragraph 121 of the complaint, namely an improvement to systems for configuring storage arrays that utilizes the "more abundant RAM" in an array controller to run a configuration utility, because that alleged improvement is not recited in any of the claims of the '891 patent.  *See* ECF No. 54 at 18-19.  Defendants argue that the claims of the '891 patent "do not provide any recitation of the structure or components of the array controller to address problems arising from the limited amount of RAM on the host processor."  *See id.*

HPE responds that claim 1 is directed to a particular improvement in technology, not the abstract idea that Defendants advance.  Citing portions of the specification, HPE contends that the claims of the '891 patent recite and are directed to "a novel computer system configuration where an array controller (instead of a host processor as in traditional systems) runs an array configuration utility" using "the local RAM existing on the array controller rather than the [limited] base memory available to the host processor[.]"  *See* ECF No. 69 at 21-22 (citing '891 patent at 2:16-19).  HPE contends that this alleged improvement overcomes the "memory

36

United States District Court
Northern District of California

1  deficiencies in host processors during startup" for configuring storage arrays that are discussed in

2  the specification. *See id.* HPE further contends that claim 1 recites sufficient structure for patent

3  eligibility. *Id.* at 22-23.

4          The Court agrees with Defendants that claim 1 is directed to an abstract idea and not to the

5  improvement that HPE advances. Claim 1 recites (1) an array controller configured to run an

6  array configuration utility, which is itself configured to generate information corresponding to a

7  menu of user options, receive instructions from a processor corresponding to a user selection, and

8  process a configuration task in response to those instructions; and (2) a processor that is

9  configured to receive the information from the array controller and send the user instructions to

10 the array controller. *See* '891 patent, claim 1. The limitations of claim 1 amount to nothing more

11 than the abstract idea of providing menu options for configuration tasks and performing

12 configuration tasks based on user selections from those menu options using generic computer

13 components and processes.

14         The improvement for configuring storage arrays during big real mode that is discussed in

15 the specification, and which HPE contends is the focus of claim 1, avoids the 1 MB base memory

16 limitation of prior systems for configuring storage arrays during big real mode by using an array

17 controller to run a configuration utility on the array controller using "*the local RAM existing on the*

18 *array controller*[.]" *See id.* at 2:15-21 (emphasis added). That improvement is not recited in

19 claim 1 or in any of the remaining claims of the '891 patent. Claim 1 recites an "array controller"

20 but it does not require that the array controller include local RAM and that such local RAM be

21 used by the array controller to run the configuration utility. The Federal Circuit has held that,

22 "when analyzing patent eligibility, reliance on the specification must always yield to the *claim*

23 *language* in identifying th[e] focus" of a claim and that "the specification cannot be used to import

24 details from the specification [into the claims] if those details are not claimed." *See ChargePoint,*

25 *Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019) (emphasis added). In light of

26 *ChargePoint*, which Defendants cite in support of their motion and which HPE has not

27 distinguished, the details of the improvement discussed in the specification cannot take claim 1

28 outside of the realm of abstraction because those details are not claimed. *See id.* at 769 ("Even a

specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea.").

HPE argues that Defendants "wrongly assert that the claimed array does not include sufficient structure or components for patent eligibility" because the "specification expressly describes the controller's hardware." *See* ECF No. 69 at 22-23. HPE points to portions of the specification that state that the array controller "may" include an embedded microprocessor and local RAM. *See* ECF No. 69 at 23; *see also* '891 patent, 2:62-67; 3:1-3. HPE's argument is an implicit invitation to the Court to construe "array controller" as including an embedded processor and local RAM. The Court declines to construe "array controller" as including an embedded processor and local RAM for the purpose of resolving the present motion because the only support that HPE offers for that construction are portions of the specification that indicate that an embedded processor and local RAM are *optional* components of an array controller, as they "may" or may not be included in an array controller.[14] *See* '891 patent, 2:62-67, 3:1-3 (providing that an array controller "may" include an embedded microprocessor and local RAM). Because local RAM existing on the array controller is an essential feature of the improvement over the prior art that is discussed in the specification, the claims of the '891 patent needed to have recited that feature to permit a finding that the claims are directed to that improvement. This is because "[e]ligibility depends on what is claimed, not all that is disclosed in the specification." *See Trading Techs*, 921 F.3d at 1095; *see also ChargePoint*, 920 F.3d at 766-69. As discussed above,

---

[14] HPE argues that disputes about claim construction must be resolved in its favor at this stage. *See* ECF No. 69 at 20. That is incorrect. "If there are claim construction disputes at the Rule 12(b)(6) stage, . . . *either* the court must proceed by adopting the non-moving party's constructions, . . . *or* the court must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *See Aatrix*, 882 F.3d at 1125 (emphasis added). Here, to the extent that there was a dispute about how to construe the "array controller" limitation, the Court has resolved it to the extent required to conduct the § 101 analysis as set forth above. HPE also argues, in passing, that claim construction "may be required" with respect to other terms in the '891 patent before the Court can resolve Defendants' § 101 challenge to that patent. *See* ECF No. 69 at 26. The Court disagrees and finds that there are no other any claim construction disputes that require resolution to conduct the § 101 analysis with respect to the '891 patent.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  claim 1 does not require that the array controller have local RAM or that such local RAM be used

2  to run the configuration utility on the array controller; thus, the Court cannot find that claim 1 is

3  directed to the improvement discussed in the specification.

4      HPE also argues that claim 1 is directed to an improvement to computer "memory storage"

5  and not an abstract idea because it is similar to the claims in *Visual Memory LLC v. NVIDIA*

6  *Corp.*, 867 F.3d 1253, 1259-62 (Fed. Cir. 2017).  That argument fails.  In *Visual Memory*, the

7  specification described the claimed invention as an improved memory system that is "achieved by

8  configuring a programmable operational characteristic of a cache memory based on the type of

9  processor connected to the memory system."  *See id.* at 1261.  The Federal Circuit held that the

10  claims at issue were directed to that improved memory system because the details of the

11  improvement were both discussed in the specification *and* recited in each of the claims.  *See id.*

12  (reasoning that "*both the specification and the claims* expressly state that this improved memory

13  system is achieved by configuring a programmable operational characteristic of a cache memory

14  based on the type of processor connected to the memory system") (emphasis added).  Here, by

15  contrast, the memory-related improvement described in the specification and cited by HPE is not

16  recited in claim 1 or in any of the claims of the '891 patent, as discussed above.

17      Because claim 1 fails to recite any "assertedly inventive technology for improving

18  computers" and instead is directed to the abstract idea of providing menu options for configuration

19  tasks and performing configuration tasks based on user selections using generic computer

20  components and processes, the claim is ineligible at step one.  *See Int'l Bus. Machines Corp. v.*

21  *Zillow Grp., Inc.*, 50 F.4th 1371, 1378-79 (Fed. Cir. 2022) (holding that claims were directed to an

22  ineligible abstract idea because they failed to recite "any assertedly inventive technology for

23  improving computers as tools . . . and are instead directed to an abstract idea for which computers

24  are invoked merely as a tool") (citations and internal quotation marks omitted).

25                      **(ii)    *Alice* step two**

26      At *Alice* step two, courts look for an "inventive concept" and consider the elements of each

27  claim both individually and as an ordered combination to determine whether the additional

28  elements of the claim transform the nature of the claim into a patent-eligible application.  *Alice*,

573 U.S. at 217.  To be eligible at step two, the claim's additional elements must involve more than well-understood, routine, and conventional activity.  *Berkheimer*, 881 F.3d at 1367.  "An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself, and cannot simply be an instruction to implement or apply the abstract idea on a computer."  *Bascom*, 827 F.3d at 1349.

Defendants argue that claim 1 is not patent eligible at step two because it simply applies the abstract idea of providing menu options for configuration tasks and performing configuration tasks based on user selections using conventional computer activity and components.  *See* ECF No. 54 at 19.

The Court agrees.  Claim 1 implements the abstract idea of providing menu options for configuration tasks and performing configuration tasks based on user selections using computer activity and components, such as a "processor" and an "array controller," that the specification indicates are generic.[15]  *See* '891 patent, 2:39-67, 3:1-57.  In other words, claim 1 merely invokes conventional computer components and activity to apply the abstract idea identified at step one. That is not enough to render claim 1 patent eligible at step two.  *See Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020) (holding that claim was ineligible at step two in relevant part because it "merely invokes well-understood, routine, conventional components and activity to apply the abstract idea identified previously" at step one); *see also Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021) (holding that a claim is ineligible if it "is recited at a high level of generality and merely invokes well-understood, routine, conventional components to apply the abstract idea," and the "generic hardware limitations . . . merely serve as 'a conduit for the abstract idea'") (citation omitted).

United States District Court
Northern District of California

---

[15] HPE refers to the "array controller" as "novel," *see* ECF No. 69 at 22, but it does not point to any portion of the specification that indicates that an "array controller" is not generic or conventional.  The features of the array controller that are discussed in the specification as being an improvement over the prior art, namely the array controller having local RAM and using that local RAM to run a configuration utility during big real mode, are not claimed, as discussed above.

1       HPE argues that claim 1 is patent eligible at step two because it claims an unconventional

2   use of the array controller, which it contends "is an improvement upon computer memory storage

3   itself." ECF No. 69 at 22-23. This is unconvincing. As discussed above, no memory

4   improvement is recited in claim 1. The improvement for avoiding the 1MB of RAM base memory

5   limitation of prior systems for configuring storage arrays during big real mode that is discussed in

6   the specification, *see* '891 patent, 2:15-19, is not recited in claim 1 or any of the other claims of

7   the '891 patent. Because the claim language of claim 1 does not recite the inventive concept

8   discussed in the specification to which HPE points, it is not patent-eligible at step two. *See*

9   *Trading Techs.*, 921 F.3d at 1095 ("Eligibility depends on what is claimed, not all that is disclosed

10  in the specification."); *ChargePoint*, 920 F.3d at 773 ("At step two of the *Alice* inquiry—the

11  search for an inventive concept—we consider *the elements of each claim* both individually and as

12  an ordered combination to determine whether the additional elements 'transform the nature of the

13  claim' into a patent-eligible application.") (citation and internal quotation marks omitted,

14  emphasis added).

15      The authorities that HPE relies upon to argue that claim 1 is patent eligible at step two,

16  which are not binding, do not support that proposition. In *Immersion Corp. v. Fitbit, Inc.*, 313 F.

17  Supp. 3d 1005, 1023 (N.D. Cal. 2018) and *Polaris Innovations Ltd. v. Kingston Tech. Co., Inc.*,

18  223 F. Supp. 3d 1026, 1033 (C.D. Cal. 2016), the claims at issue were held to be patent eligible

19  because they were not directed to an abstract idea at step one. Those holdings are irrelevant to the

20  issue here, which is whether claim 1 is patent eligible at *step two*. In *Avocent Huntsville, LLC v.*

21  *ZPE Sys., Inc.*, No. 3:17-CV-04319-WHO, 2018 WL 1411100, at *7-9 & n.8 (N.D. Cal. Mar. 21,

22  2018), the court held that the claims at issue were patent eligible at step two because "[*t*]*he claims*

23  *themselves* detail the structure of the system" that was the inventive concept of the claimed

24  invention as described in the specification, which was an improvement the functioning of network

25  management systems. *See id.* (emphasis added). Here, by contrast, none of the claims of the '891

26  patent recite the inventive concept described in the specification.

27

28

In light of the foregoing, the Court concludes that claim 1 is not patent eligible under § 101. Accordingly, the Court grants Defendants' motion to dismiss claims asserted in the complaint that are premised on the alleged infringement of claim 1, with leave to amend.

### b.        Claims 2 through 12

Defendants contend that the rest of the claims of the '891 patent, claims 2 through 12, are ineligible under § 101 for the same reasons as claim 1 because they are directed to the same abstract idea as claim 1 at step one and, at step two, they merely invoke conventional components and activity to apply the abstract idea identified at step one.

After carefully reviewing claims 2 through 12 individually, the Court agrees with Defendants. At step one, claims 2 through 12, like claim 1, are directed to the abstract idea of providing menu options for configuration tasks and performing configuration tasks based on user selections. At step two, claims 2 through 12 merely invoke conventional computer components and activity to apply the abstract idea identified at step one, which is not enough for eligibility. *See Elec. Commc'n Techs.*, 958 F.3d at 1183. Accordingly, the Court finds that claims 2 through 12 are ineligible under § 101 for the same reasons as claim 1.

HPE contends that claims 2 through 12 recite additional elements not recited in claim 1 that make them patent eligible, but its arguments are unpersuasive.

With respect to claim 2, HPE contends that it recites that "the array configuration utility is configured to run during real mode operation," which it argues constitutes a "patent-eligible improvement to the computer system" because it allows the array configuration utility to be run "while the computer system is in real mode, when the amount of memory available to the host processor is highly limited[.]" *See* ECF No. 69 at 24. The limitation to which HPE points does not alter the Court's conclusion that claim 2 is not patent eligible, because the specification does not indicate that running a configuration utility during real mode is a technical solution that improves the computer itself compared to the prior art and that involves more than the performance of well-understood, routine, and conventional activities. *Cf. Cooperative Entertainment*, 50 F.4th at 131-135. As discussed above, the improvement described in the specification has to do with *the memory* used to run the configuration utility during real mode; the

United States District Court
Northern District of California

1    improvement requires that local RAM existing on the array controller be used for that purpose.

2    The limitation in claim 2 to which HPE points does not recite that improvement.

3        With respect to claims 3 through 5, HPE argues that they recite "additional components

4    coupled to claim 1's novel array controller that are configured to run an array configuration."

5    ECF No. 69 at 24-25. Because HPE does not explain why the "additional components" recited in

6    claims 3 through 5 make the claims patent eligible, the Court finds no reason to alter its

7    conclusion that those claims are not patent eligible for the reasons discussed above.

8        With respect to claim 6, HPE argues that it "recites that a PCIe bus couples the array

9    controller to the host processor," which, according to HPE, means that the claim "recites that the

10   array controller is a separate element connected to the host via the PCIe bus, thereby improving

11   the claimed computer architecture." *See* ECF No. 69 at 25. The Court finds that the PCIe bus

12   limitation in claim 6 does not alter the Court's conclusion that the claim is not eligible because a

13   PCIe bus is a generic computer component (i.e., a type of "communications bus," *see* '891 patent,

14   3:6-9), and because the limitation does not supply the inventive concept described in the

15   specification, as it does not require that the array controller have and use local RAM existing on

16   the array controller to run the configuration utility.

17       With respect to claims 7 and 8, HPE argues that they "recite that the processor comprises a

18   remote management controller, which can hardly be considered a conventional computer

19   component as Defendants argue." *See* ECF No. 69 at 25. The Court finds that the "remote

20   management controller" limitation in claims 7 and 8 does not transform the claims into a patent

21   eligible invention because a remote management controller is a generic computer component, *see*

22   '891 patent, 5:25-31, and because it does not supply the inventive concept described in the

23   specification.

24       With respect to claim 9, HPE does not make any arguments to attempt to show that it

25   contains additional limitations not found in claim 1 that render it patent eligible. *See* ECF No. 69

26   at 25. The Court interprets that as an implicit concession that claim 9 is ineligible under § 101 for

27   the same reasons as claim 1, as Defendants have shown and the Court has found.

28

United States District Court
Northern District of California

With respect to claims 10 through 12, HPE argues that they "recite specific computer-readable instructions that perform certain functions when executed by the array controller or host processor." *See* ECF No. 69 at 25.  Because HPE does not explain why the "certain functions" recited in claims 10 through 12 make the claims patent eligible, the Court finds no reason to alter its conclusion that those claims are not patent eligible for the reasons discussed above.

In light of the foregoing, the Court concludes that claims 2 through 12 are not patent eligible under § 101.  Accordingly, the Court grants Defendants' motion to dismiss claims asserted in the complaint that are premised on the alleged infringement of claims 2 through 12, with leave to amend.

### 3.    Whether the Infringement Claims Against Betapex Are Adequately Pleaded

Defendant Betapex moves to dismiss all direct, indirect, and willful infringement claims that HPE asserts against it for failure to state a claim, arguing (1) that HPE "does not allege that Betapex makes, uses, sells, or offers to sell any accused product," and (2) that the "only alleged activity" in the complaint that is attributed to Betapex is that "it 'functions as a real estate company.'"  *See* ECF No. 54 at 22-23 (quoting ECF No. 1 ¶ 65).

HPE opposes the motion, arguing that Betapex has not met its burden to show that its infringement claims against Betapex are subject to dismissal for failure to state a claim because, among other things, Betapex cites no authority that supports finding that the claims at issue are insufficiently pleaded.  *See* ECF No. 69 at 28.

The Court agrees with HPE.  Betapex fails to cite any authority in its opening brief that shows that the allegations in the complaint fail to state a claim against it for direct, indirect, and willful patent infringement.  The only authority that Betapex cites in its opening brief for the proposition that HPE's allegations are insufficient is *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1147 (9th Cir. 2018).  *See* ECF No. 54 at 23.  However, that case is inapposite because it addresses the standard for pleading *copyright* infringement, not patent infringement.

Moreover, even considering Betapex's reply arguments on their merits, the Court still finds that HPE's direct infringement claims are adequately pleaded.  A direct infringement claim does

require that HPE have pleaded that Betapex makes or sells an accused product. *See, e.g., Garrett v. TP-Link Rsch. Am. Corp.*, No. 20-CV-03491-SI, 2020 WL 5517202, at *3 (N.D. Cal. Sept. 14, 2020). HPE satisfies this requirement, however, by alleging that Betapex provides the facilities used by its parent corporation to make and sell infringing products. ECF No. 1 ¶ 66. In its reply brief, Betapex challenges the inferences to be drawn from HPE's complaint and the exhibits thereto. *See* ECF No. 71 at 17–18.[16]

Accordingly, the Court denies Betapex's motion to dismiss under Rule 12(b)(6). *See Shay v. Apple Inc.*, 512 F. Supp. 3d 1066, 1071 (S.D. Cal. 2021) ("On a motion to dismiss, it is the defendant's burden to demonstrate that plaintiff has failed to state a claim.") (collecting cases).

## V.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (ECF NO. 86)

Defendant IEIT Systems moves to dismiss under Rule 12(b)(6) all claims for induced infringement and willful infringement that HPE asserts against it. *See* ECF No. 86. HPE opposes the motion. ECF No. 90.

### A.    Legal Standard

As noted, to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Iqbal*, 556 U.S. at 678. In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel*, 393 F.3d at 1072.

### B.    Discussion

#### 1.    Willful Infringement

"[N]o binding appellate decisions discuss the pleading requirements for a willful infringement claim." *BSD Crown, LTD. v. Amazon.com, Inc.*, 684 F. Supp. 3d 993, 999 (N.D. Cal. 2023) (Orrick, J.) (citation omitted). In applying the Federal Circuit's rules for proving willful infringement, courts in this district have held that, to survive a motion to dismiss, a plaintiff

---

[16] Betapex does not address HPE's allegations of induced infringement and willful infringement in its motion to dismiss, making arguments regarding those claims for the first time on reply. The Court declines to consider these arguments. "[A] district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

United States District Court
Northern District of California

1    must plausibly plead that the defendant had pre-suit knowledge of the patent-in-suit and that the

2    defendant infringed it deliberately or intentionally.  *See id.* (citing *Eko Brands, LLC v. Adrian*

3    *Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020)); *Dali Wireless, Inc. v. Corning*

4    *Optical Comm'ns LLC*, 638 F.Supp.3d 1088, 1095 (N.D. Cal. 2022) (Chen, J.) (citing *Bayer*

5    *HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) and *BASF Plant Sci., LP v.*

6    *Commonwealth Sci. & Indus. Rsch. Organisation*, 28 F.4th 1247, 1247 (Fed. Cir. 2022)).  "To

7    plead deliberate or intentional infringement, plaintiffs may plead knowledge of infringement,

8    which they can do by pleading that the accused infringer had a specific intent to infringe at the

9    time of the challenged conduct."  *BSD Crown*, 684 F. Supp. 3d at 1002 (citation and internal

10   quotation marks omitted).

11        HPE asserts claims against all Defendants for willful infringement of the asserted patents.

12   These claims are based on allegations that the "Inspur Defendants," collectively, intentionally

13   infringed the asserted patents because they have had actual knowledge of the asserted patents and

14   the accused products' infringement of the same since HPE sent Defendants notice letters regarding

15   infringement in 2021 and 2022.  *See* ECF No. 1 ¶¶ 31, 86-89, 99-102, 112-15, 125-28, 138-41.

16        IEIT Systems argues that HPE has not stated a claim against it for willful infringement

17   because the complaint lacks allegations that raise the inference that (1) IEIT Systems had pre-suit

18   knowledge of the asserted patents, and (2) IEIT Systems specifically intended to infringe the

19   asserted patents (i.e., that IEIT Systems knew that its actions infringed the asserted patents).  The

20   Court agrees.

21        First, the complaint is devoid of plausible allegations that IEIT Systems knew of the

22   asserted patents before this litigation began.  HPE's allegations that all "Inspur Defendants"

23   collectively had "actual knowledge" of the asserted patents prior to this litigation, *see, e.g.*, ECF

24   No. 1 ¶¶ 86-88, 99-101, 112-14, 125-27, 138-140, are conclusory and, accordingly, the Court

25   disregards them for the purpose of resolving the present motion.  *See Celgene Corp. v. Mylan*

26   *Pharms. Inc.*, 17 F.4th 1111, 1128 (Fed. Cir. 2021) ("[W]e disregard rote recitals of the elements

27   of a cause of action, legal conclusions, and mere conclusory statements.").  HPE alleges that it sent

28   a letter to IEIT Systems on October 8, 2021, which stated that HPE's patent licensing strategist

1    wished to set up an "introductory call" with someone from Inspur Group's intellectual property

2    team to discuss HPE's and Inspur Group's "respective patent portfolios." *See* ECF No. 1 ¶ 31 &

3    ECF No. 1-1 at 163.[17]   Because this letter neither mentioned the asserted patents nor stated that

4    IEIT Systems was infringing the asserted patents, the Court cannot reasonably infer based on this

5    letter that IEIT Systems knew of the asserted patents before this action began.  *See Seoul*

6    *Semiconductor Co. v. FEIT Elec. Co*., No. CV2205097ABSHKX, 2023 WL 2629881, at *2 (C.D.

7    Cal. Feb. 8, 2023) ("When a patentee relies on a letter to support a willful infringement claim,

8    '[t]he letter must communicate a charge of infringement of specific patents by a specific product

9    or group of products.'") (quoting *Funai Elec. Co. v. Daewoo Elecs. Corp*., 616 F.3d 1357, 1373

10   (Fed. Cir. 2010)); *Dali Wireless*, 2022 WL 1426951, at *4 (holding that alleged discussions

11   between the parties about the plaintiff's patent portfolio are not sufficient to raise the inference

12   that the defendant had pre-suit knowledge of the patents-in-suit in the absence of allegations that

13   the plaintiff "identified the specific patents" at issue to the defendant).

14          HPE argues that the Court may infer that IEIT Systems had pre-suit knowledge of the

15   asserted patents because it alleges that it sent notice letters on August 24, 2021, and February 4,

16   2022, *to a different defendant*, namely Defendant Aivres, which is allegedly IEIT Systems'

17   wholly-owned subsidiary and which HPE contends has a "close relationship" with IEIT Systems.

18   *See* ECF No. 90 at 13-16; *see also* ECF No. 1-1 at 159-63.  The Court is not persuaded.  IEIT

19   Systems' cited authority, which HPE has not distinguished, holds that, generally, "corporate

20   entities are understood to be separate and distinct" in the context of patent-infringement claims.

21   *See Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co*., No. CV 19-1334-RGA-CJB,

22   2021 WL 2036671, at *5 (D. Del. May 20, 2021), *report and recommendation adopted in relevant*

23   *part and rejected in part on other grounds*, No. 19-CV-1334-RGA, 2021 WL 4350591 (D. Del.

24

25   ───────────────

26   [17] A copy of the notice letters alleged in the complaint is attached to the complaint.  *See* ECF No.
     1-1 at 159-63.  The Court may consider the copy of the notice letters without converting the
27   present motion into a motion for summary judgment because the letters were attached to and
     explicitly relied upon in the complaint.  *See Celgene,* 17 F.4th at 1128 ("[A] document integral to
28   or explicitly relied upon in the complaint may be considered without converting the motion to
     dismiss into one for summary judgment.") (citation omitted).

United States District Court
Northern District of California

Sept. 24, 2021). By contrast, HPE cites no authority that a court may infer that a defendant had pre-suit knowledge of a patent-in-suit based on allegations that the plaintiff sent notice letters to the defendant's wholly-owned subsidiary. The authorities that HPE does cite are distinguishable. In those cases, courts held that the plaintiff adequately pleaded that the defendant had pre-suit knowledge of the patent-in-suit because the plaintiff alleged to have sent a notice letter describing the patents-in-suit and alleged infringement of the same *to the defendant* (i.e., the alleged infringer), not to the defendant's subsidiary or corporate affiliate. *See Litebook Co., Ltd. v. Verilux, Inc*., No. SACV2201124CJCJDEX, 2023 WL 2733463, at *4 (C.D. Cal. Feb. 7, 2023) (holding that the plaintiff adequately pleaded that the defendant had pre-suit knowledge of the patent-in-suit because it alleged that it sent a letter to the defendant stating that the defendant's products infringed the patent-in-suit); *ACQIS LLC v. Lenovo Grp. Ltd.*, No. 6:20-CV-00967-ADA, 2022 WL 2705269, at *5 (W.D. Tex. July 12, 2022) (same); *Seoul Semiconductor Co. v. FEIT Elec. Co.*, No. CV2205097ABSHKX, 2023 WL 2629881, at *2 (C.D. Cal. Feb. 8, 2023) (same).[18]

Second, the complaint is devoid of plausible allegations that IEIT Systems specifically intended to infringe the asserted patents (i.e., that IEIT Systems infringed the asserted patents while knowing that it was infringing). Where, as here, the plaintiff has not plausibly alleged that the defendant had pre-suit knowledge of the patent-in-suit, the plaintiff necessarily fails to plausibly plead that the defendant had the specific intent to infringe the same. *See BSD Crown*, 684 F. Supp. 3d at 1002 ("[B]ecause BSD fails to plead that AWS or Twitch knew of the patent, these defendants could not plausibly have intended to infringe the patent").

---

[18] Other cases that HPE cites in its opposition are inapposite because they do not address the question of whether pre-suit knowledge of the patent-in-suit can be imputed from one corporate affiliate to another, or because they do not address the issue of pre-suit knowledge of the patent-in-suit at all. *See, e.g.*, *InVue Sec. Prods. Inc. v. Mobile Tech*, Inc., No. 3:19-CV-407-SI, 2019 WL 5295464, at *5 (D. Or. Oct. 18, 2019) (holding that a court may infer that a defendant had pre-suit knowledge of a patent-in-suit based on circumstances not alleged in the complaint here, such as the existence of a licensing agreement between the plaintiff and defendant and the defendant's connection with the plaintiff's former employee who worked on the patent-in-suit); *Celgard, LLC v. Shenzhen Senior Tech. Material Co. (US) Rsch. Inst*., No. 19-CV-05784-JST, 2021 WL 9763371, at *5 (N.D. Cal. Feb. 8, 2021), *opinion vacated in part on other grounds on reconsideration*, No. 19-CV-05784-JST, 2021 WL 11714935 (N.D. Cal. Dec. 7, 2021) (resolving motion to dismiss where the defendant's pre-suit knowledge of the patents-in-suit was not at issue).

United States District Court
Northern District of California

1    Accordingly, the Court grants IEIT Systems' motion to dismiss HPE's claims against it for

2    willful infringement, with leave to amend.

3                    **2.    Induced Infringement**

4    Under section 271(b) of the Patent Act, "[w]hoever actively induces infringement of a

5    patent shall be liable as an infringer." 35 U.S.C. § 271(b). "For an allegation of induced

6    infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that

7    the accused infringer specifically intended [another party] to infringe [the patent] and knew that

8    the [other party]'s acts constituted infringement." *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d

9    1372, 1379 (Fed. Cir. 2017) (citation and internal quotation marks omitted, alterations in the

10   original). "[L]iability for induced infringement can only attach if the defendant knew of the patent

11   and knew as well that the induced acts constitute patent infringement." *Commil USA, LLC v.

12   Cisco Sys., Inc.*, 575 U.S. 632, 640 (2015) (citation and internal quotation marks omitted).

13   HPE asserts claims against all Defendants for inducement of infringement of the asserted

14   patents. These claims are based on allegations that the "Inspur Defendants" are "knowingly

15   inducing" their customers to infringe the asserted patents by continuing to sell the accused

16   products to their customers with the "specific intent to encourage them to use" the products in a

17   manner that the "Inspur Defendants know to be infringing." *See* ECF No. 1 ¶¶ 84, 97, 110, 123,

18   136.

19   IEIT Systems moves to dismiss HPE's claims against it for induced infringement, arguing

20   that the complaint lacks facts that raise the inference that (1) IEIT Systems had pre-suit knowledge

21   of the asserted patents, and (2) IEIT Systems knew that the acts it induced constituted

22   infringement. IEIT Systems makes the same arguments that it made in support of its motion to

23   dismiss HPE's willful infringement claims and, in response, HPE makes the same arguments that

24   it advanced in opposition to IEIT Systems' motion to dismiss the claims for willful infringement

25   asserted against it.

26   The Court finds that HPE has failed to state a claim for induced infringement against IEIT

27   Systems for the reasons stated in IEIT Systems' motion. First, the complaint does not contain

28   plausible allegations that IEIT Systems knew of the asserted patents prior to this litigation. For the

United States District Court
Northern District of California

reasons discussed above, the October 8, 2021, letter that HPE allegedly sent to IEIT Systems is insufficient to raise the inference that IEIT Systems knew of the asserted patents before this litigation began because it does not mention the asserted patents. *See Parity Networks, LLC v. Moxa Inc*., No. SACV20698JVSKESX, 2020 WL 6064636, at *4 (C.D. Cal. Sept. 11, 2020) ("Courts, including this one, have found allegations of inducement of patent infringement to be insufficient where pre-suit notice fails to tie allegedly infringing features or designs to particular patents.") (citation omitted). Allegations that HPE sent notice letters to IEIT Systems' subsidiary also do not raise the inference that IEIT knew of the asserted patents because HPE has not cited any authority showing that its subsidiary's knowledge of the asserted patents can be imputed to it.

Second, the complaint does not contain plausible allegations that IEIT Systems knew that the acts it allegedly induced constituted infringement of the asserted patents (i.e., that it specifically intended to induce infringement of the asserted patents). Because HPE has not plausibly alleged that IEIT Systems had pre-suit knowledge of the asserted patents, HPE necessarily fails to plausibly allege that IEIT Systems knew that any acts it allegedly induced constituted infringement of those patents. *Cf. Gardner v. Engenious Designs LLC*, No. 21-2548-HLT-ADM, 2022 WL 1442846, at *4 (D. Kan. May 6, 2022) (finding as plausible allegations that the defendant had specific intent to induce infringement because the plaintiff alleged that the defendant continued to offer the accused products for sale after it learned via a notice letter from the plaintiff that the accused products infringed the patent-in-suit).

Accordingly, the Court grants IEIT Systems' motion to dismiss HPE's claims against it for induced infringement, with leave to amend.

## CONCLUSION

For the foregoing reasons, the Court:

(1) DENIES Inspur Group's motion to dismiss for lack of personal jurisdiction WITHOUT PREJUDICE to re-filing, if appropriate, after jurisdictional discovery is completed. Within fourteen days of the date this order is filed, the parties shall file a proposal as to the scope and duration of jurisdictional discovery, as discussed in more detail above;

(2) DENIES Kaytus' motion to dismiss for lack of personal jurisdiction;

1    (3) GRANTS Defendants' motion to dismiss all patent infringement claims asserted in the

2    complaint premised on the alleged infringement of U.S. Patent No. 7,634,671 and U.S. Patent No.

3    8,335,891, with leave to amend;

4    (4) DENIES Betapex's motion to dismiss all patent infringement claims that HPE asserts

5    against it for failure to state a claim; and

6    (5) GRANTS IEIT Systems' motion to dismiss the willful infringement and induced

7    infringement claims that HPE asserts against it, with leave to amend.

8    To the extent that it can do so without contradicting the allegations in the operative

9    complaint, HPE may file an amended complaint within 30 days of the date of this order to cure the

10   deficiencies identified above.  Failure to file a timely amended complaint will result in dismissal

11   with prejudice of claims that the Court has dismissed with leave to amend.

12   This order terminates docket numbers 54, 84, 85, and 86.

13   **IT IS SO ORDERED.**

14   Dated:  March 10, 2025



_____
JON S. TIGAR
United States District Judge